**Rose Marie REID, Plaintiff-Appellant,**

v.

**Michael SILVER and Michael and Rose Silver Foundation, Defendants-Appellees.**

**Rose Marie REID, Plaintiff-Appellee,**

v.

**Michael SILVER, Defendant-Appellant.**

**Nos. 14884, 14885.**

United States Court of Appeals Seventh Circuit.

Dec. 28, 1965.

Gerald C. Snyder, Waukegan, Ill., James G. Culbertson, Chicago, Ill., Kline D. Strong, Salt Lake City, Utah, for Rose Marie Reid.

Harold Stickler, A. Bradley Eben, Chicago, Ill., for Michael Silver.

Before HASTINGS, Chief Judge, and DUFFY and CASTLE, Circuit Judges.

HASTINGS, Chief Judge.

Rose Marie Reid brought this diversity action in the district court against Michael Silver, a certified public accountant, for an accounting of moneys and other assets entrusted to him and to terminate an employment contract. A number of other defendants were named in the complaint, including Michael and Rose Silver Foundation, but the issues raised as to them are not germane to the determination of this appeal.

The issues were joined on the complaint and a counterclaim filed by Silver. At this point, the trial court stated, "As I read the papers, here is a woman who turned over a huge fortune to a Certified Public Accountant. Now she wants an accounting for it."

Silver objected to giving an accounting and represented that an accounting had been made prior to the commencement of the action. Whereupon, on July 30, 1963, the trial court referred the cause to a special master on the issue of plaintiff's right to an accounting by Silver.

The master studied the pleadings and applicable Illinois law and held two brief preliminary hearings on August 1 and August 22, 1963, and conferred with counsel on September 10 and September 18, 1963. On September 27, 1963, the master served counsel with his proposed report and recommendations.

In this proposed report, the master found in substance that plaintiff employed Silver as an accountant about January, 1953, and that a confidential and fiduciary relationship arose there-

from and existed until June 1, 1962. He found that funds belonging to plaintiff were deposited in various Chicago and California banks in Silver's accounts and that Silver, purporting to act as plaintiff's agent, maintained in his own name or under his control divers investments in special assessment bonds, real estate transactions in Chicago and Florida and certain joint ventures in which plaintiff, Silver, and others were interested. He finally found that Silver had made no full, complete and detailed accounting to plaintiff concerning such transactions.

The master then reported as conclusions of law that Silver acted in a fiduciary capacity as agent of plaintiff and stated the applicable Illinois law and concluded that Silver should be required to make his accounting in complete detail and file the same with the master, subject to examination and objections by the parties with full right to discovery procedures related thereto.

The master recommended that an appropriate decree be entered agreeable with his findings and conclusions.

Silver objected to the filing of the proposed master's report and asked leave to present testimony to show that Silver had already made an accounting to plaintiff. Such leave was granted and extensive hearings were had. Subsequently, after submission of briefs, including suggested findings and conclusions by the parties, the master prepared his final report. He entered findings of fact, stated conclusions of law and made recommendations to the district court.

In substance, the master recommended that the complaint be dismissed for want of equity; claimed an allowance of $25,000 as fees to himself for services and recommended that his fees and the costs be taxed equally between plaintiff and Silver.

The district court denied plaintiff's objections to the master's report, confirmed the report and ordered each party to pay one-half of the costs, including the master's fee of $25,000, and entered a final judgment accordingly. It is from this order and final judgment that plaintiff has appealed in No. 14884.

The question for decision on appeal is whether the critical findings of fact are clearly erroneous and whether the court applied the correct legal criteria to the facts as disclosed by the record. Since the district court adopted the report and recommendations of the master without change, we necessarily look to the product of the master's actions.

The hearings before the master covered a substantial part of 13 days. The transcript of the master's proceedings comprised about 1800 pages of testimony and over 100 exhibits. The master filed a lengthy report and the objections and other documents filed by the parties are voluminous. We have been required to make a careful examination of this record in order to resolve the questions before us.

Plaintiff, Rose Marie Reid, a Canadian by birth, who had no academic business education nor more than minimal schooling beyond high school, is a fashion designer. She is an industrious and enterprising woman and for many years has been engaged in designing, manufacturing, promotion, display, and sales of "Rose Marie Reid" bathing suits.

In 1946, for the purpose of engaging in the bathing suit business in the United States, Mrs. Reid formed the Rose Marie Reid Corporation in California with a Mr. Kessler, dividing the stock equally. Mrs. Reid engaged in designing and fabric-making while Kessler attended to financing and customary business matters.

In 1949, Mrs. Reid sold her interest in the corporation, including her patents and the use of her name, receiving annually 1% of the gross sales of the company. The contract of sale apparently established this purchase price as payment on principal and, thus, as a capital gain to Mrs. Reid. As a consequence, Mrs. Reid encountered difficulties with

the Internal Revenue Service over the taxable character of the income.

While this tax problem was still pending, Mrs. Reid met Silver, who was from Chicago. At a dinner with Silver, Mrs. Reid mentioned her tax problem. Silver inquired into the details, recommended a course of action and agreed to speak to the corporation officials. Ultimately, after discussions with Silver, Mrs. Reid's lawyers took her case to the Tax Court and received a favorable ruling.

Mrs. Reid was highly appreciative of Silver's efforts and was unrestrained in her praise of him.

Between 1953 and 1956, Silver acted as a tax consultant to Mrs. Reid's attorneys and accountant, as well as handling the insurance and financial matters relating to her and her family, and discussed investments with her. In effect, Silver became Mrs. Reid's business manager.

Mrs. Reid and Silver entered into an oral agreement, the terms of which were disputed before the master, that resulted in the following general activities of Silver. Silver sought out from time to time investments in joint enterprises to be formed with his friends and contacts. In such investments as Silver found and made, Mrs. Reid was included co-equally with Silver as a co-investor. In these deals, Silver occasionally acted as nominee of Mrs. Reid. Silver used funds belonging to Mrs. Reid to finance his part of the co-investments. These advances were treated by Silver as interest free loans without a specific repayment date.

Although there was contradictory testimony, the master found that the oral agreement was entered into in "about July, 1955," that the oral agreement provided for the acts described above, and that the agreement was entered into in order to satisfy Mrs. Reid's desire to find investments which would give her capital appreciation, capital gains income, and cash flow, resulting from taxable deductions.

In November, 1956, Mrs. Reid and Silver, without the presence of any third party, executed an employment contract and power of attorney prepared by Silver, the term of which ran to December 21, 1961. As compensation, Silver was to be paid annually 5% of the gross income Mrs. Reid received from all sources, with a maximum compensation of $15,000 per year. This agreement was altered in the following month to extend the term of employment and power of attorney until December 31, 1966.

Silver opened a number of bank accounts in his name for Mrs. Reid in Chicago, to which were transferred funds of Mrs. Reid.

Before and after the execution of the employment contract, Silver made joint enterprise investments with himself and Mrs. Reid as co-investors, at times purchasing the interest solely in his own name. It appears that in these investments, the entire sum invested was drawn from Mrs. Reid's funds. Silver treated the transactions as a purchase by himself and Mrs. Reid of equal interests and considered himself to have been made a no-interest loan equal to one-half the purchase price of the investment (or the price of his share) by Mrs. Reid.

The master found that all advances Silver made to himself for his portion of the joint ventures were reimbursed to Mrs. Reid.

In at least one instance, in a joint venture in special assessment bonds, the loan from Mrs. Reid was repaid through application of the entire income from the bonds (collections on the bonds, distributable to the bond owners) to the debt. Although it is not clear, it appears that bond income already belonging to Mrs. Reid was applied to reduce the debt.

In addition to these joint-venture loan transactions, Silver may have made interest free loans to himself out of Mrs. Reid's funds in order to pay for a house he was building and to purchase stock for his wife.

In June, 1962, because of Mrs. Reid's support of a business venture of her

son, and because of her desire to have her son become more familiar with her affairs, Mrs. Reid, after a phone call to Silver (who was convalescing from a heart attack) notified Silver's lawyer, Jess Raban, that her son and a lawyer were arriving in Chicago for the purpose of meeting with Raban. Mrs. Reid directed Raban to give them information regarding all of her affairs and to allow them to take whatever records they needed.

Pursuant to the notice, Raban met a number of times with the son, Bruce Reid, and Kline D. Strong, her lawyer. Silver was present at one meeting. When Reid and Strong attempted to get specific information, Raban replied that he didn't have it, but would try to get it if a memorandum was given him. Strong wrote a memorandum.

Subsequent to these meetings, Strong wrote a letter to Silver. Rather than ask questions relating to all the assets and properties of Mrs. Reid in Silver's control, Strong drafted specific questions concerning only one of the properties. Strong stated that other questions relating to that property might follow Silver's reply. Questions relating to the remaining properties were to be raised successively, in the same manner.

After a telephone call to Mrs. Reid, Raban sent her a letter (Ex. 47), the last part of which read:

"I appreciate your intention that your son, Bruce, be informed of all of your affairs which are being handled by Mike, but it would seem to me to serve no good purpose to have Bruce go through all the old personal files of Mike that relate to your investments and affairs, to want to check all of the old monthly reports made by the real estate agents on your various properties, etc. On the other hand, if the reports rendered to date (or which may be furnished to you hereafter) do not give you all the information that you think you need in order to have Bruce fully

informed regarding your affairs, Mike is prepared to sit down with you and give such other information as you desire.

"I certainly do not think that it would serve your best interests to request that Bruce and his attorneys be furnished with 'historical' data or personal records of Mike Silver from years back which may relate in part to the investments which he has handled for you. Also, the problems involved in unearthing, segregating and explaining the same might interfere with Mike's efficient and diplomatic handling of your personal and investment affairs in the future."

Mrs. Reid replied by a letter to Silver (which was given to Silver on July 2, 1962) in which she stated:

"Very simply, I want to turn all of the things you have been doing for me over to Bruce, and I have asked Stafford [Grady, an attorney for Mrs. Reid] to go to Chicago to accomplish this.

"Stafford has seen the copies of my financial affairs that you have given me, but these do not answer the questions he asks me, nor that I have wondered about so I will be grateful if you will go back through the years and give him the information."

On July 2, 1962, Grady met with Raban and Silver. At this meeting, Raban testified, there was talk of a settlement.

On his return to California, Grady wrote a long letter to Silver (dated July 10, 1962), acknowledged receipt of certain documents, noted certain points of agreement that had been reached in the meeting, recited his understanding of what further documents would be furnished him, and made inquiries with respect to certain items.

On August 28, 1962, Silver answered this letter in detail, except for a refusal to explain his reasons for his investments and expenditures of Mrs. Reid's funds.

Silver excused himself on the ground, among others, that all the transactions he made for Mrs. Reid were made with her approval.

On the same day, August 28, 1962, Kline D. Strong, an attorney for Mrs. Reid, wrote to Raban advising him that any action taken by Silver after Silver's reception of a letter sent him by Strong (dated August 24, 1962) would be deemed to be wholly voluntary: in effect, a termination of Silver's authority to represent Mrs. Reid.

Mrs. Reid's complaint instituting this suit was filed thereafter on November 2, 1962.

Over the period from the time of the original employment contract to just prior to the institution of suit, Silver charged Mrs. Reid $72,500 for accounting services and $90,000 for his services under the employment contract. The specific nature of the service was not disclosed, and it is not possible from the record to determine whether Mrs. Reid received, annually, the gross income of $300,000 which, under the employment contract, would have justified Silver's annual maximum compensation under the contract of $15,000, which he in fact charged for each of the six years he was employed under the contract.

Plaintiff contends, in effect, that the master's critical findings of fact were clearly erroneous, that contracts between plaintiff and Silver were erroneously not held to be invalid, that an accounting had not been given, that an accounting was improperly denied the plaintiff, and that the assessment of one-half the costs and fees against the plaintiff was improper.

The master found that in the meeting between Grady, Silver and Raban the parties agreed to a settlement in which, *inter alia,* all transactions and "accountings" between the parties were ratified.

With respect to the question of an accounting, the master made the following findings:

"Silver made full and complete reports to plaintiff of all assets, property, transactions, investments and funds handled by him as her agent from the inception of their relationship until the commencement of this suit. These reports were made in accordance with the course of dealings and reporting practice which developed between the parties of keeping Mrs. Reid constantly informed of her transactions and affairs. In this connection, based upon telephone conversations several times per week between them, Mrs. Reid and Silver spoke to each other on the telephone on at least one thousand separate occasions concerning her property, investments, transactions and affairs. Moreover, based upon the fact that Silver made trips to the Los Angeles area to confer with Mrs. Reid on the average of at least two or three times per year for periods of one week or longer per trip, Mrs. Reid conferred with Silver in California at least twenty-two to twenty-four weeks in the aggregate during the period from 1953 until about March, 1962, concerning her property, investments, transactions and affairs, in addition to various occasions when they met in Chicago, New York or Florida.

"A large part of the reports from Silver to Mrs. Reid were in writing, in the form of letters, accounting work sheets, summaries, schedules, bank book entries, federal and state income tax returns and other writings, which were given to Mrs. Reid or exhibited to her and discussed with her from time to time with supporting vouchers during the course of her relationship with Silver. Numerous documents of this kind were introduced in evidence by Silver, as described below, which, in combination, amounted to a complete disclosure to her of her property, assets, transactions and affairs covering the whole period of their relationship from its inception until concluded by Mrs. Reid. These documents show that, including funds, bank balances and property inter-

ests paid over or delivered to Mrs. Reid, or her attorneys after this case was started, Mrs. Reid received an accounting of funds and property, aggregating at least $1,752,743.86 * * *."

The master's finding that in "about July, 1955" the plaintiff entered into an oral agreement with Silver under which Silver would seek out investments and Mrs. Reid would advance funds both for herself and Silver, Silver to repay without interest as soon as he conveniently could, is not supported by the evidence. While the record supports the existence of the agreement, the record also shows that the agreement was made in November, 1956 and not in "about July, 1955."

A close reading of the record in the context of the correspondence which took place preceding and subsequent to the July 2, 1962 meeting indicates that if there was a settlement, it was predicated upon the deliverance to Grady, to Grady's satisfaction, of Mrs. Reid's assets and information and explanation of items in statements given by Silver to Mrs. Reid.

While there may have been an agreement regarding the termination of the relationship between Silver and Mrs. Reid and the transfer of Mrs. Reid's assets, the master's finding that a settlement regarding an accounting for and ratification of past activities had been made is not supported by the evidence and is clearly erroneous.

It has been admitted, and the master concluded, that Silver was a fiduciary. It is, therefore, clear that Silver was a fiduciary when the oral investment agreement and the employment contract were created.

With respect to transactions between a fiduciary and his beneficary, the Illinois law is specific.

"A fiduciary relation exists in all cases in which there is confidence reposed on one side and a resulting superiority and influence on the other * * *. Where such a relationship exists at the time of a transaction whereby the dominant party appears to gain at the expense of the dependent party, the transaction is to be deemed presumptively fraudulent and will be set aside unless the one in whom the confidence and trust is reposed establishes its fairness by clear and convincing proof. * * *. Important factors in determining whether a particular transaction is fair include a showing by the fiduciary: (1) that he made a free and frank disclosure of all the relevant information he had; (2) that the consideration was adequate; and, (3) that the principal had competent and independent advice before completing the transaction." Works v. McNeil, 1 Ill.2d 47, 52, 115 N.E.2d 320, 322 (1953).

In the record before us, there is no clear and convincing proof, and the master drew no conclusion, that the contracts and the activities carried out pursuant to them were fair.

The fairness of the contracts can be determined only after the fairness of the activities carried out under the cloak of the contracts is revealed. In order to make that preliminary determination, it is essential that there be an accounting. .

It is true, as Silver contends, that no particular system of accounting is required of a fiduciary. This is true, however, only insofar as "it can be ascertained what property has come into his hands, what has passed out and what remains therein, including all receipts and disbursements in cash, and the sources from which they came, to whom paid and for what purpose paid." Wylie v. Bushnell, 277 Ill. 484, 491, 115 N.E. 618, 622 (1917).

The record shows that the reports and statements Silver gave to Mrs. Reid could, at the time of the hearing before the master, be interpreted by Silver to reveal the reasons for disbursements and to indicate repayments of loans and explain charges. It also shows that Mrs. Reid was inattentive to financial details and that she expressed her lack of con-

cern with detail to Silver. Even if Silver made similar oral explanations to Mrs. Reid at the time certain records were given her, it cannot be said that, in view of her inattentiveness, the combination of the records and oral explanations, given at different times, concerning many different matters, and of an uncertain degree of thoroughness, constitute, in law, the kind of accounting a fiduciary is required to give.

It is clear that in assessing the evidence of accounting, the master was greatly impressed by the apparent carelessness in the dealing between Mrs. Reid and Silver. But the fact that the parties engaged in an informal course of dealing does not entitle the fiduciary to make less than a full disclosure of his dealing with the beneficiary's funds. Informality is not a license. An informal course of dealing may obscure what the beneficiary consented to, but it does not validate all the actions of the fiduciary. This is particularly true where the alleged consent to the fiduciary's actions is in the nature of a general, prior acquiescence born of deep trust and distaste for detail rather than a specific permission or agreement to certain acts after careful consideration.

The duty of the fiduciary is controlled, not by the informality of the course of dealing, but by the depth of and the possibilities of wrong inherent in the particular fiduciary relation between the parties. Where it appears that the very informality of fiduciary relationship is used by the fiduciary to create transactions for his own obvious advantage, while the advantage of the entire course of dealing for the beneficiary is not apparent and cannot be determined by the court from the evidence, the fiduciary must give a satisfactory accounting in order to overcome the presumption of fraud. Cf. Works v. McNeil, supra; Wylie v. Bushnell, supra.

The conclusion of law which the master drew and which apparently justified his final recommendation with respect to an accounting is as follows.

"Where the agent has rendered periodical accounts to the principal, to which the principal has acquiesced over a period of years, the principal can not thereafter object to the method of accounting or as to the sufficiency of the accounts."

This conclusion is not supported by the authorities cited in its behalf and cannot be said to have adequately interpreted the facts as disclosed by the record.

In sum, our examination of the record and the applicable law in this case makes certain things quite clear to us.

Silver was a certified public accountant. He occupied a fiduciary relationship with plaintiff. He was entrusted with more than $1,400,000 of plaintiff's funds. He did not keep an adequate set of records showing how he handled the funds and other property held in trust. He failed to make a full and complete disclosure and accounting to plaintiff of his management of plaintiff's property and affairs. He apparently used various amounts of plaintiff's funds for his own purposes. He apparently repaid plaintiff certain alleged interest free loans to himself from plaintiff's own income. He paid to himself the sum of $90,000 for services under a so-called employment contract. He paid to himself the sum of $72,500 for "accountant's fees." He did not negotiate a binding final settlement of his claims against plaintiff or of her claims against him. In his fiduciary transactions with plaintiff, he has not made a full and fair disclosure to plaintiff in conformity with the high standard of fairness required in such circumstances.

It is also clear to us that plaintiff is and was a shrewd business woman and has been less than cooperative with all parties concerned in trying to get at the whole truth in this vexatious litigation. She owes an equal duty of fairness to the courts in seeking a full understanding of what took place between the parties during the period of their business relationship.

We make no findings of fraud in this matter at this time. This can only be determined after a full and complete accounting by Silver.

We hold that the critical findings of the master, as adopted by the trial court, relating to an accounting by Silver are not adequately supported by the record and are clearly erroneous. The legal conclusions drawn from such erroneous findings necessarily must fall.

The amount of the master's fees ($25,000), as claimed by the master and allowed by the court, is charged by plaintiff to be excessive. Each party claims the other party should be assessed with the payment of all costs, including the master's fees.

Except for the master's claim, the record is barren on this subject. While we feel the allowance was quite liberal in amount, even approaching the point of being excessive, in the absence of countervailing evidence, we shall not disturb the finding and order of the trial court in this respect. The master's fee, as allowed, will stand and each party shall pay one-half of it and all other costs in the action.

We shall remand this matter to the district court to enable it to require a full and complete accounting by Silver of all his actions in handling plaintiff's moneys, property and business affairs from the beginning of their business relationship.

We note, in passing, that the master denied Silver the right of discovery in California. This was error. Since the purpose of further proceedings herein is to arrive at the full truth so that the courts may be enabled to make a complete and final determination of this dispute, if necessary, full discovery should be allowed to each party. Each party is enjoined to fully cooperate with the district court in this endeavor.

For the foregoing reasons, that part of the order and judgment appealed from relating to the master's fees and payment thereof by the parties is affirmed.[1]

In all other respects, the order and judgment appealed from is hereby vacated and set aside and this cause is remanded to the district court for further proceedings not inconsistent with this opinion.

Affirmed in part, vacated in part and remanded.

---

1. In No. 14885, defendant Silver appealed from that part of the order taxing one-half of the costs, including the master's fees, to him.